FIRST NATIONAL BANK OF ST. JOHNS AND ALVIN SHAVER v. GEORGE W. TYLER AND MELVIN J. TYLER.

*Fraudulent mortgage—Parties to bill in aid of execution.*

1. Indorsers joined with their principal in an action on his note need not be joined with him as defendants to a bill in aid of the execution issued thereon where the property levied on belongs to the principal alone.

2. Plaintiffs in separate actions, in which executions against the same defendant were simultaneously levied, are collectively and ratably

interested in the levy and are proper co-complainants in a bill in aid of such execution.

3. A defendant pending suit gave his brother a mortgage which, if valid, would make a judgment against him worthless. It was given ostensibly to secure a debt, the existence of which had been carefully concealed, even from the mortgager's family, and most of which would be outlawed unless it had been renewed. The supposed debtor had always appeared to be prosperous and the indications were that the debt would never have been heard of but for the impending judgment. The original evidences of it had been suppressed or destroyed. *Held*, that the case could not be treated as one in which a brother, for relationship's sake, had refrained from pressing his claims; and that he was not entitled to take precedence over others as a bona fide creditor.

Appeal from Clinton. (V. H. Smith, J.) Oct. 21.— Nov. 19.

BILL in aid of execution. Complainants appeal. Reversed.

*Spaulding & Barker* for appellants.

*Mitchel, Bell & McGarry* for appellees. A bill in aid of execution must be sworn to (Chancery Rule 103) and all the judgment debtors made parties defendant, or it must be affirmatively alleged and proved that those who are not made parties defendant are wholly destitute of property: *Van Cleef v. Sickles* 5 Paige 505; *Williams v. Hubbard* 1 Mich. 446; *Shaver v. Brainard* 29 Barb. 25.

CAMPBELL, J. Plaintiffs in April, 1884, severally recovered judgments against defendant George W. Tyler and certain other parties who were indorsers on his individual notes, for the aggregate in four judgments of $1653.67. Executions were issued and simultaneously levied on George W. Tyler's farm in Clinton county, being the east half of the northeast fractional quarter and the southwest quarter of the northeast quarter of section 2 in town 8 north, of range 4 west, containing about 170 acres. The suits were begun in January, 1884, and on March 11, 1884, George W. Tyler, who was married and living on his land, mortgaged, without his wife's signature and with intentional concealment from her, all of this land to his brother, the defendant Melvin J.

Tyler, for $7000 payable at the end of five years, with interest annually. This property, it is alleged, was so mortgaged in fraud of complainants, and the bill is filed in aid of execution. The court below dismissed it, but we are not informed on what ground. It seems to be assumed that it was on the merits.

There are some preliminary questions which it is proper to refer to. It is suggested that the other parties defendant in the judgments should be brought in, and also that it does not appear that they have not property to satisfy the claims. If this had been a judgment creditor's bill to reach equitable assets, founded on inability to get redress at law, these objections might need consideration. But here the complainants have found property which they propose to reach at law, and which it is proper, if they can make out their case, to exhaust before seeking equitable assets. The judgments are not upon any joint liability of the several defendants at law, and are only obtained under our peculiar statute which allows maker and indorsers to be sued together, but does not require it, or place them on the footing of ordinary joint debtors. No one but the judgment debtor principal has any interest in this land beyond what Melvin J. Tyler has as mortgagee. There was no occasion to implead them.

Neither is there a misjoinder of complainants. These complainants are interested collectively and ratably in the levy which the bill is filed to aid, and they represent all of such interests. There is no rule of equity which precludes their joinder. On the contrary it might be open to question whether they are not in any event necessary parties complainant or defendant. They are certainly proper co-complainants.

The question then comes down to the single inquiry, whether the mortgage is fraudulent against complainants.

It appears that defendants are brothers, living four or five miles apart; George being about forty-nine years old and Melvin four years older. George has a wife and family, and has, since he went upon his farm, improved it considerably and put up valuable buildings, large and well built; and it is worth

about $10,000, and was subject at the time of these transactions to a mortgage of $2200. He had a growing wheat crop, and had upon the farm a considerable amount of farming stock and implements. He was apparently a prosperous and well-to-do farmer.

Some time before the mortgage to his brother was given and before these suits were brought, and soon after the notes matured, George had conversation with complainant Shaver, whom he visited to confer about his debt, and complainant recommended him to raise money by mortgage so as not to be bothered by notes occasionally coming due. George told him he had this farm, worth eight or ten thousand dollars, which was subject to the $2200 mortgage, and that if he had $2500 he could square all his indebtedness, and could get along with enough to make $4500, including the existing mortgage. George gives a somewhat different version, claiming he did not say this was all his indebtedness; but complainant is corroborated, and we have no doubt he was given to understand so. Complainant introduced him to some men having money to lend, but he did not get the loan he wanted and would not take less.

On March 11, 1884, he made two mortgages to Melvin, one of $7000 on the farm, and one of $1200 on the wheat crop, which was seventy acres. He had already given a mortgage on the moveable property on the farm, to Melvin, a short time before. This mortgage is not produced and its date and conditions do not appear. He also conveyed by deed absolute his interest in a mill which was subject to his mother's life-estate.

The consideration for these transactions is claimed to be a series of notes of various amounts, beginning in 1862 and ending in 1880, upon which at this time Melvin was anxious to get security. It appears that under some arrangement between the brothers, Melvin took these notes to a neighbor, Mr. Sunderlin, and got him to compute the whole amount due for principal and interest. Mr. Sunderlin figured it up and informed the parties. The principal, according to his recollection, was something less than $4000, and the aggre-

gate principal and interest was $8220. The paper containing this figuring was not produced, and neither of defendants can give any statement of the size and other essentials of the notes. The sum was divided so as to put $7000 on the land and $1200 on the wheat. The mortgages were not drawn up by Mr. Sunderlin. These securities and transfers covered · the whole of George's property; and apparently absorbed it.

It appears from the testimony of Melvin that he did not wish George's wife to know anything about these matters, and that the existence of the debt had been purposely concealed from her, although she is shown to have been informed of the other debts against her husband.

All of this debt, if existing, except one note the amount of which is not given accurately, but not over $700, was outlawed, and some of it dated back' more than twenty years. The account given by defendants is that Melvin advanced to George from time to time small sums, and took due-bills; that after a while they would meet and have a settlement, and George would give a note running for one year on interest, and in this way all the notes originated. It is claimed that during all this period there never was any money paid to Melvin, who himself incurred some debts on his own account, while George went on in apparent prosperity, building to the amount of some $5000, and living in such a way as to create no suspicion in his family or elsewhere, that he was under any debt whatever beyond what was public and within his means. And as already mentioned, he not only got credit as such, but a few months before these arrangements declared that he was not so indebted.

Under all these circumstances it is claimed for the defense that Melvin must be treated as a bona fide creditor and incumbrancer, and that complainants must lose all remedy against their debtor, who, according to this showing, has been insolvent all along for years, while he has appeared to be perfectly good, and whose apparently prosperous condition, if fictitious, is due to the intentional concealment from his family, if not from the public, of the brother now appearing as creditor.

If such a claim can be maintained against the honest creditors who have acted on these appearances, it is so unjust, and so difficult of scrutiny by any but the two interested parties, that it requires strict proof to entitle it to any consideration. It cannot be regarded as having the same meritorious basis as the claim of a wife who has lent money to her husband, which, in the usual order of harmonious married life she would seldom be expected to press by hostile remedies, and could not, therefore, be suspected of wrong in delaying. There may be among friends and kinsmen a great amount of similar lenity, but it certainly is not so common as to exempt those who run such risks from showing their rights very clearly when they are seeking, after long delay, to get the better of other creditors.

In the present case there are several peculiarities that render it very inequitable to prefer the defendant Melvin's mortgage, and which indicate that this security would never have been heard of if the debt had been intended to be pressed as between the parties. And there is a lack of explanation which is due to their action in destroying testimony, which, whether from good or bad motives, is a very serious matter here.

It appears in the first place that most of the debt had been outlawed for several years, and that only a small portion was in force, if any. It appears and is avowed that the existence of any portion of this claim, which originated more than twenty-two years ago, had been successfully concealed from the family of George, and there is nothing to indicate that it was known during this long period to anybody else. The effect of this, apart from enabling George to obtain false credit, was, if the debts existed and were renewed, to render his estate insolvent, and to leave no inheritance to his heirs, and no personalty to the widow. But if not renewed, the death of George would have left all his creditors secure, and given a considerable balance to his family. It becomes, therefore, of some importance to know whether it was understood that these alleged advances were regarded as actually existing debts in good faith.

One of the strongest reasons for doubting it is that no precautions were taken against loss by failure to keep the debts renewed.  Death, at least, was among the possibilities of so long a period, and would have cut them off.  But it appears directly that defendant Melvin, if we have all the facts and are to accept his statements as full, did on several occasions call for and obtain what he calls settlements.  These consisted in consolidating small due-bills into single notes, payable in one year from date.  It is not easy to understand how this should have been done without including in the settlement notes of all the previous paper outstanding, and especially such as was running out.  Such would be the natural course if there was really any desire to obtain a settlement.  If this was done, instead of all these notes being valid, the later ones would have been renewal notes superseding the others.  The only other natural course would have been to obtain written renewals on the old notes.  Not only was this not done, but it does not appear that during the preparations for getting the new securities now in litigation any step was taken to obtain a temporary written acknowledgment, although we are asked to believe that there was an actual pressure brought to bear on George.

It was therefore very desirable, at least, that in a controversy which it is manifest both of them were anticipating, these original notes should be kept in existence to furnish evidence of the consideration of the securities.  Had there been no likelihood of litigation, a careless man might destroy such vouchers, instead of canceling them.  But they were all destroyed, when other creditors were suing, and we have no testimony which even tends to show the exact date or terms of any of them.  Mr. Sunderlin testifies to making calculations from papers that appeared to be old and worn, but his attention was not called to anything which would determine their genuineness, and his calculation was also destroyed, or at least is not produced.

Furthermore, it appears that a chattel mortgage, which is not produced, was made on the farm personalty before this final calculation, and does not appear to have been taken into

the account in arranging the amount of these latter securities, which were made to cover the whole debt. And there is no explanation given by defendants, although there is by Sunderlin, why, after obtaining what was made in the shape of a security, an absolute conveyance was given of the title to all or an undivided part of a mill property, which is talked of as if it were a contingent interest of no special account, when in fact it was a vested estate, subject only to the life-estate of the mother of defendants.

There are also some other remarkable facts. When Sunderlin was spoken to about the securities, it is shown that he suggested the necessity of getting the wife's release, and that Melvin objected to doing so, and said that he would rather suffer some loss. In this connection Sunderlin advised him to get the mill property. It is not claimed that any price was put on it or any credit given for it. But the first chattel mortgage covered exempt property, which the husband could not mortgage without the wife's assent, and the farm was a homestead, on which, so far as the homestead right extended, the land mortgage was absolutely void without the wife's signature. It is impossible that in any genuine arrangements between debtor and creditor for security such facts could have been overlooked. When asked on cross-examination why he took all of his brother's estate, the defendant Melvin answered: "I ain't took it yet, have I?" which was a singular answer if he was really intending to enforce a claim which he professed, at least, to suppose would exhaust everything.

All of these circumstances indicate that the transaction which was nominally hostile was really friendly, and intended to protect George's family or himself from creditors. It was but a short time since George had asserted that his unsecured debts did not exceed $2500. He had been openly endeavoring to obtain a further loan on that basis. It was only after his failure to do this, and the prospect of impending judgments and levies, that the interests of Melvin come to the surface, and he appears as pressing claims which had ceased to be legally collectible. It is impossible from this record to believe that these old demands would ever have been heard of

if there had not been danger that George's property would be sold to pay his debts. He distinctly acknowledged this, as shown by the testimony of what appears to be a credible witness. The facts indicate it quite as clearly.

If the notes did not represent actual debts to their full amount, then there was a gross fraud in fact. If it was understood that the debts, if ever existing, were to be considered as outlawed, and so extinguished, and the condition of George was purposely allowed to appear in good credit, it is open to doubt, at least, whether a subsequent renewal should give them preference over active creditors. But in this case no one can doubt that the purpose of both these defendants was to defeat the judgment creditors, and was not in good faith to secure existing debts. In our opinion, the defendants have given no satisfactory proof that there was anything in existence which was, as between them, regarded as a binding obligation. And we also think that these securities were really designed to protect George and not to secure Melvin as a creditor.

We think that the mortgage should be declared void as against the levy in question, and that the complainants should have the relief prayed.

The decree should be reversed with costs of both courts and a new decree entered accordingly.

The other Justices concurred.